CONGREGATIONAL SOCIETY AND CHURCH IN NEWINGTON *v.* NEWINGTON.

In 1765 the town of Newington bought and paid for a tract of land, and accepted a deed thereof, running to a committee appointed for that purpose, which contained the following declaration of the use to which the premises were conveyed : " To and for the use of the inhabitants of said Newington, and their successors, for a parsonage, and the use and support of the ministers of the gospel." Ever since 1810 the town has at all times used the premises, and taken and applied the profits thereof to its municipal purposes, under a claim of right to do so, and with the knowledge of the plaintiff society. In a bill in equity, brought by a religious society in town against the town, praying for an account of the

rents and profits, and a decree for a performance of the trusts created by the deed—*Held*, that there had been such a distinct repudiation and disavowal of the trust, and such an adverse holding of the premises, as to make a complete legal and equitable title in the town, even admitting the relation of the parties to have been that of trustee and *cestui que trust*.

IN EQUITY, the following facts appeared at the hearing: July 19, 1765, the town of Newington purchased of Nicholas Knight about twenty acres of land in said town, and appointed Joseph Patterson and Benjamin Adams to take a deed thereof, which they did, in their own names. The consideration was paid wholly by the town of Newington. The deed describes the grantees, Patterson and Adams, as "a committee of Newington to take a deed of the premises hereinafter described, for the use hereafter expressed." It is a deed, with full covenants of warranty, and conveys the land in question for the consideration of two thousand five hundred pounds, old tenor, "to and for the use of the inhabitants of the town of said Newington, and their successors, for a parsonage, and the use and support of the ministers of the gospel." From the year 1715 to 1810 there was in Newington a Congregational society and church, with a settled pastor, except one interval of about five years. During that period the preaching was supported by the town, and one pastor, at least, employed and settled by the town, from 1788 to 1810 ; and the society worshipped in a meeting-house furnished and maintained by the town. From 1810 to 1859 the society had no settled minister, and no regular supply, but various ministers of that denomination occupied the old meeting-house, but not constantly, there being occasional intervals of considerable duration,—at one time about three years, commencing in 1850. Sometimes this society divided the time with other denominations, who were allowed, by vote of the town, to occupy the pulpit part of the time, in connection with the Congregationalists, including the Baptists, Methodists, Universalists, and Episcopalians. In November, 1859, the Rev. John L. Bosquet was ordained as the minister of this society, and held that place until October 31, 1863 ; and November 1, 1864, Rev. Mr. Davis was settled as the pastor, and held the place up to the filing of the bill. At the close of the year 1862, or the beginning of 1863, the religious society was organized under the general law, by the corporate name of the Congregational Society of Newington, which society has ever since had regular religious worship in the old meeting-house, which has been remodelled. From 1715 down to 1863 there was in Newington a Trinitarian Congregational society, although not legally incorporated or organized, but maintaining religious services in the same meeting-house during all that period, with some interruptions, having had settled pastors ninety years. Until 1810 there was no other religious society in Newington, and after that there was occasional preaching there of other denominations, and especially the Methodists, who sometimes had preaching there for several years together, occu-

pying the old meeting-house half the time, until about 1838 or 1840. They built a new meeting-house, and occupied it until about 1860 or 1862, when it was burned down, and has not been rebuilt. Since the filing of this bill the Methodist society has been organized, but at the time of filing the bill there was no religious society organized in that town except the plaintiff's. Since 1810 the town has at all times used said parsonage, and taken and applied the profits thereof to its municipal purposes, under a claim of right to do so, and with the knowledge of the plaintiff society. The bill prays that an account be taken of the income so received by the town and misapplied, and the amount decreed to be paid to the plaintiffs; that the trusts in said deed be performed and carried out; that the pastor of said society and church be allowed to occupy said premises; that the income thereof be applied to the support of the ministers of the gospel in said town; that the sale of land and wood be restrained by injunction; and for general relief.

The questions thereupon arising were reserved for consideration by the whole court.

*Frink*, for the plaintiffs, cited *Newmarket* v. *Smart*, 45 N. H. 101; *Candia* v. *French*, 8 N. H. 135; Comp. St., ch. 137, sec. 8; *Milton* v. *First Parish*, 10 Pick. 447; *Ludlow* v. *Dikes*, 19 Pick. 317; *Shrewsbury* v. *Smith*, 14 Pick. 297; *Baptist Society* v. *Wilton*, 2 N. H. 511; *Beatty* v. *King*, 2 Pet. 431; *Holden* v. *Chem*, 8 B. Mon. 78; *Price* v. *Methodist Church*, 4 Ham. 452; *The Dublin case*, 38 N. H. 459.

*Hatch*, for the defendants, cited *Baptist Society* v. *Wilton*, 2 N. H. 508; Com. Dig., Condition A (6); *United States* v. *Rodman*, 15 Pet. 130; Perry on Trusts, sec. 119; *Benson* v. *Whittam*, 5 Sim. 22; *Leach* v. *Leach*, 13 Sim. 304; *Thorp* v. *Owen*, 2 Hare 607; Perry on Trusts, sec. 99; *Jones* v. *Locke*, L. R., 1 ch., ap. 25; Prov. Act, 1719, ch. 6, sec. 4, p. 139; *Candia* v. *French*, 8 N H. 133; *Newmarket* v. *Smart*, 42 N. H. 97; Perry on Trusts, sec. 864; *Merriam* v. *Hassam*, 14 Allen 522; *Baker* v. *Whiting*, 3 Sumner 486; 2 Story Eq., sec. 1520; *Att'y-Gen.* v. *Prop. M. H. on Federal St.*, 3 Gray 162.

LADD, J.  The case finds that since 1810 the town has at all times used said parsonage, and taken and applied the profits thereof to its municipal purposes, under a claim of right to do so, and with the knowledge of the plaintiff society; also, that there was in Newington, from 1715 down to 1863, a Trinitarian Congregational society, although not legally incorporated or organized, but maintaining religious services in the same meeting-house during all that period, with some interruptions, and that, at the close of the year 1862 or the beginning of 1863, the religious society was organized under the general law by the corporate name of the Congregational Society of Newington, which society has ever since had regular religious worship in the old meeting-house.

We think these facts show a ground upon which the case must be decided in favor of the defendants, without going into the question whether the deed created a trust in the town ; for, assuming (what was probably the fact) that, when the town accepted the deed from Nicholas Knight containing the explicit declaration that the premises were for a parsonage, and for the use and support of the ministers of the gospel, a charitable use was created for the object specified, and that the town, either in its municipal or parochial capacity, was therefore invested with the legal title as trustee, charged with the duty of administering the fund in behalf of the charity mentioned in the deed, we still think it is impossible to reach any other conclusion than that there has been such a distinct disavowal and renunciation of the trust by the town, and such an uninterrupted occupation, for a period of more than sixty years,—or more than fifty years, if we reckon from 1819, when what is known as the Toleration Act was passed,—adverse to the right of the plaintiffs and all others, who may have had an interest in the premises, as must perfect the title in the trustee, even against a *cestui que trust.* The act was unequivocal. During all this long time the town took and applied the profits of the premises to its municipal purposes, under a claim of right to do so, and with the knowledge of the plaintiff society. No more unmistakable disavowal of the trust can well be conceived. When the town thus distinctly repudiated the trust, not only these plaintiffs, but all others, if there were others, who claimed an equitable interest and right in the premises, as *cestuis que trust,* were bound to come forward and assert their claims. There is no pretence that the plaintiffs were under any disability during this period, and we think their right is gone by reason of the adverse occupation of the property by the town.

It is true, that, to enable a trustee without giving up the possession to turn it into an adverse holding against the *cestui que trust,* the evidence must be clear and unmistakable, and such adverse claim must be brought home to the *cestui que trust* beyond question or doubt. Perry on Trusts, sec. 864. We think these conditions are entirely fulfilled in the present case, and that the        *Bill must be dismissed.*